# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON

_____

|  |  |  |
|---|---|---|
| **LAWRENCE EDWARD NORTON, SR.,** | ) | Shelby County Circuit Court |
|  | ) | No. 142777 R.D. |
| Plaintiff/Appellant. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9609-CV-00222 |
|  | ) |  |
| **BRENDA KAY NORTON**, | ) |  |
|  | ) |  |
| Defendant/Appellee. | ) |  |
|  | ) |  |

**FILED**

**October 1, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

From the Circuit Court of Shelby County at Memphis.
**Honorable George H. Brown, Jr., Judge**


**Stuart Brian Breakstone**, LAW OFFICE OF DON OWENS, P.A., Memphis
Attorney for Plaintiff/Appellant.


**Lee Ann Pafford Dobson**, THE LAW OFFICES OF JOHN R. JOHNSON, III, P.C., Memphis
Attorney for Defendant/Appellee.


OPINION FILED:

**AFFIRMED AND REMANDED**


**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**INMAN, Sr.J.**: (Concurs)

This litigation concerns dissolution of a marriage 24 years in duration. The appellant, Lawrence Edward Norton, Sr. ("Husband"), has appealed from the final decree of divorce, challenging the correctness of the trial court's decision to award the appellee, Brenda Kay Norton ("Wife"), one-half of his railroad retirement benefits, rehabilitative alimony and attorney's fees. For reasons expressed below, we affirm and remand.

Husband filed his complaint for divorce in June 1993 on grounds of inappropriate marital conduct and irreconcilable differences. Wife filed a counterclaim citing the same grounds and additionally alleging that Husband had committed adultery. A hearing was conducted on November 15, 1995 with the following evidence adduced: Husband is 44 years of age and wife, 43. Both attained a twelfth grade education and are in good health. Their union produced two children. Their daughter remained a minor (age 15) at the time of trial.

Husband has been employed with the Illinois Central Railroad Company for 26 years. The Company's general foreman, Joaquin Flores, testified that Husband is employed as a machinist and that his current rate of pay is $16.04 an hour based on a 40 hour work week, for a gross annual salary of $33,491.52. Flores explained that this figure is based on Husband's employment as a machinist for a full year. He indicated, however, that at certain times, Husband temporarily serves in other capacities (such as in a managerial position) which reflects an increase in his pay. Flores testified that during 1995 Husband received a foreman's rate of pay to reflect a temporary change in his employment status. Flores stated that Husband was also given managerial responsibilities for a time in 1993. At the present time, Flores was not aware of any proposed changes to Husband's current position as a machinist. From January to October 1995, Husband's gross earnings totaled $47,433.23. Husband's annual earnings for the years 1991-1994 were $32,804.69; $38,947.82; $34,893.20; and $36,162.74, respectively.

Husband's pension with the railroad consists of several parts including "Tier I" and "Tier II" benefits. Tier I resembles those benefits to which he would be entitled if covered by the Social Security Act, 42 U.S.C. § 401 *et. seq.* Tier II is supplemental retirement. Husband can receive full retirement benefits at the age of 65.

Wife had various occupations during the marriage. Her highest paying job yielded an hourly rate of $9.45 an hour. She is presently employed at Brannan's Snack Foods earning $7.50 an hour. Her net income is $250 per week. Her benefits include medical insurance and life insurance in the amount of $15,000. There is no retirement plan. Wife does not know whether her various occupations during the marriage qualify her for social security benefits.

Wife's Rule XIV affidavit lists assets of the parties totaling approximately $140,000,[1] excluding the marital residence which the parties valued at $105,000 with a net equity of approximately $50,000. Wife currently resides in the marital residence with the parties' children, daughter-in-law and grandchild. Wife expressed a desire to continue living in the marital home until May 1997 so that she can remain within the school district and allow the minor child to graduate from her present high school. Afterwards, she would like the home sold.

After hearing the evidence, the trial court entered a final decree awarding the divorce to Wife on grounds of inappropriate marital conduct[2] and dividing the marital estate to include an award of one-half of Husband's pension to Wife, to be computed as of December 15, 1995. The decree provides for Wife's continued residency in the marital home until July 19, 1997, at which time the home is to be listed on the market for sale. Until such sale, it is ordered that the parties shall own the home as tenants in common with each being responsible for one-half of the mortgage, taxes, insurance and all repairs and expenses exceeding $150 per expenditure. The decree awards alimony to Wife, to begin after the real estate closing, in the amount of $400 per month for two years and $250 per month for an additional two years thereafter. In establishing Husband's annual income, the decree reflects the trial court's finding that Husband's income "has fluctuated greatly for the 1995 tax year" and its imputation to Husband of "arbitrary" annual earnings of $41,000.

Husband identifies the issues on appeal as follows:

---

[1] The majority of this figure represents Husband's retirement which Wife lists at approximately $121,000 which, according to exhibit 4, includes both Tier I and Tier II benefits.

[2] Child custody was awarded to Wife. Although both parties originally sought custody, this was never a truly contested issue.

I. Whether the trial court erred in awarding Wife one half of Husband's railroad retirement where the Railroad Retirement Act of 1974 . . . , 45 U.S.[C]. §§ 231d(c)(3), 231m prohibits benefits resulting from employment during marriage to be considered community property subject to division in the event of dissolution of the marriage.

2. Whether the trial court erred in ordering Husband to pay alimony to Wife including paying the mortgage on the marital residence where Wife currently lives and ordering that the marital residence shall not be put up for sale until July 1997 and in ordering Husband to pay alimony to Wife for four years after the sale of the marital residence where Wife, by living in the marital residence, has control over how and under what circumstances the house will be sold, and that it is in her best interest for the house not to sell.

3. Whether the trial court abused [its] discretion in awarding a substantial attorney fee to Wife when there was no showing by Wife of need and no showing by Husband of ability to pay.

With respect to his first issue, Husband argues that the Railroad Retirement Act of 1974, 45 U.S.C. § 231 *et. seq.*, ("Act"), specifically prohibits the division of his retirement benefits (Tier II) as a marital asset. He relies upon the United States Supreme Court decision, ***Hisquierdo v. Hisquierdo***, 439 U.S. 572 (1979), to support his position. ***Hisquierdo*** holds that upon the divorce of the railroad employee, his retirement benefits are not to be considered as marital property subject to division. ***Hisquierdo***, 439 U.S. at 583-87. At the time ***Hisquierdo*** was decided, the following provision found at 45 U.S.C. § 231m was in effect:

> [N]otwithstanding any other law of the United States, or of any State, territory, or the District of Columbia, no annuity or supplemental annuity shall be assignable or be subject to any tax or to garnishment, attachment, or other legal process under any circumstances whatsoever, nor shall the payment thereof be anticipated[.]

***Hisquierdo***, 439 U.S. at 576.

In 1983, § 231m was amended to add subsections (b)(1) and (2). Subsection (b)(2) currently reads:

> This section shall not operate to prohibit the characterization or treatment of that portion of an annuity under this subchapter which is not computed under section 231b(a), 231c(a), or 231c(f) of this title, or any portion of a supplemental annuity under this subchapter, as community property for the purposes of, or property subject to,

distribution in accordance with a court decree of divorce, annulment, or legal separation or the terms of any court-approved property settlement incident to any such court decree. The Board shall make payments of such portions in accordance with any such characterization or treatment or any such decree or settlement.[3]

The foregoing amendment and its effect upon the decision rendered in *Hisquierdo* was addressed by the West Virginia Supreme Court of Appeals in *Pearson v. Pearson*, 488 S.E.2d 414 (W.Va. 1997) as follows:

> Retirement benefits for railroad employees are governed by federal statute. As a railroad employee the defendant, upon retirement, is entitled to benefits under the Railroad Retirement Act of 1974, (hereinafter the "Act") 45 U.S.C. § 231 *et seq.* The Act's scheme provides for two tiers of benefits which resemble both a private pension program and a social welfare plan. Tier I benefits are equivalent to those the employee would receive if covered by the Social Security Act, 42 U.S.C. § 401 *et seq.* See 45 U.S.C. § 231a(a)(1) and § 231b(a)(1). Tier II benefits are supplemental annuities which, like a private pension plan, are tied to earnings and career service. See 45 U.S.C. § 231a(b) and § 231b(e).
>
> . . . .
>
> In *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979) the United States Supreme Court considered whether an award of railroad retirement benefits to a spouse when dividing marital assets upon divorce was prohibited by the Act. The United States Supreme Court held that 45 U.S.C. § 231m specifically prohibited the division of benefits payable under the Act as property in a divorce. However, in 1983, Congress provided an amendment to § 231m which expressly permits characterization of Tier II benefits as property subject to distribution upon divorce. See 45 U.S.C. § 231m(b)(2). Notwithstanding the 1983 amendment, the holding in *Hisquierdo* is still controlling with respect to Tier I benefits.

*Pearson*, 488 S.E.2d at 421-22 (footnotes omitted).

The Ohio Court of Appeals in *Tarbet v. Tarbet*, 647 N.E.2d 254 (Ohio Ct. App. 1994), reached the same conclusion when holding that the 1983 amendment "removed the shield that [§ 231m] had provided to the treatment of certain railroad retirement benefits as marital property." *Tarbet*, 647 N.E.2d at 256. In noting that the shield remains intact for those Tier I benefits acquired

---

[3]Sections 231b(a), c(a) and c(f) relate to the computation of annuities for the individual employee, the spouse or survivor in terms of Tier I or "social security" retirement benefits. In other words, these provisions apply to those who are entitled to draw upon the individual's railroad earnings, as in the case of social security benefits, and to have their annuities computed accordingly.

by the railroad employee, *Tarbet* concludes, in reliance upon *Hisquierdo*, that their indivisibility does not allow the divorce court to consider or offset their present market value in dividing the marital estate. *Id*. *Accord Pearson*, 488 S.E.2d at 423. *Contra Mahoney v. Mahoney*, 681 N.E.2d 852, 856 & n.9 (Mass. 1997).

Husband also directs our attention to the following language found at 45 U.S.C. § 231d(c)(3):

> The entitlement of the spouse of an individual to an annuity under section 231a(c) of this title shall end on the last day of the month preceding the month in which . . . (B) the spouse and the individual are absolutely divorced. . . .

The "historical note" to § 231d indicates that subsection (c)(3) was amended in 1981 to add the following provision:

> The entitlement of the divorced wife of an individual to an annuity under section 231a(c) of this title shall end on the last day of the month preceding the month in which (A) the divorced wife or the individual dies or (B) the divorced wife remarries.

Section 231a(c) identifies those "[s]pouses eligible for annuities." Subsection (4) recognizes a "divorced wife's annuity" upon the meeting of certain conditions.

Based upon this Court's interpretation of the plain language of the Act, we find that § 231d specifically references those annuities "under § 231a(c)" which, in turn, concerns those annuities provided under 231a(a)(1)[4] or the railroad employee's "social security" retirement (Tier I), not supplemental annuities (Tier II). On the other hand, § 231a(b) pertains especially to those "[i]ndividuals eligible for supplemental annuities." Section 231(b) relates to the "[c]omputation of annuities." Section 231b(a)(1) states:

> The annuity of an individual under section 231a(a)(1) of this

---

[4]Section 231a(c)(1) provides in part, that an individual's spouse is eligible for annuities "if - (I) such individual (A) is entitled to an annuity under subsection (a)(1) of this section . . . . "

> title shall be in an amount equal to the amount (before any reduction on account of age and before any deductions on account of work) of the old-age insurance benefit or disability insurance benefit to which such individual would have been entitled under the Social Security Act . . . .

We conclude that no error was committed by the trial court in dividing Husband's Tier II retirement benefits as part of the marital estate.

Husband's next issue concerns the trial court's award of alimony to Wife. It is first argued that the trial court erroneously imputed an annual income of $41,000 to Husband when setting alimony. Husband asserts that his actual gross annual income is $33,491.52 and that his true monthly net income is $2,126. Husband's affidavit of income and expenses lists total monthly expenses of $1,421. Of that figure, $450 is a "projected" expense for rent; at the time of trial, Husband was residing with his parents. Adding $52 to this amount to coincide with the award of child support and $383.50 which represents one-half of the monthly mortgage payment, we arrive at a figure of $1,856.50. Wife's monthly net income is $1,200. She lists her monthly expenses at approximately $2,000.

The major marital assets of the parties are the marital home and Husband's pension. Wife correctly points out that the final decree does not specifically denote an equal division of the proceeds upon sale of the marital residence. We agree, however, that such division is implicit within the trial court's ruling. The division of the remaining marital assets does not indicate that either party was benefitted to a much greater extent than the other.

It is Husband's contention that the foregoing demonstrates a lack of need for support on Wife's behalf and a lack of ability to pay on his part. He argues that such is further evidenced by Wife's possession of over $8,000 in her bank account at the time of trial. We find the record to indicate a figure of approximately $5,000, hardly an amount to alter the current needs of Wife.

The decision to award alimony is within the sound discretion of the trial court. Such decision is factually driven and requires a balancing of the factors set forth in T.C.A. § 36-5-101(d). The two most significant factors are need and the ability to pay. **Loyd v. Loyd**, 860 S.W.2d 409, 412

(Tenn. App. 1993). We find the record before us to support the trial court's award of alimony considering the various statutory factors at play and all others relevant. We further find the amount of the award appropriate. Even if Husband's annual earnings are as he suggests, $33,491.52, he still has a monthly income in excess of his expenses, as we have determined them, unlike Wife. We, however, believe the figure proposed by Husband is inadequate. With the exception of tax year 1991, his annual earnings have consistently exceeded this figure. While we agree that Husband's 1995 earnings thus far are somewhat inflated and "unusual," as described by the trial court, we do not find the imputed figure of $41,000 to be excessive or unsupported by the record.[5]

Husband also disputes the manner in which alimony was awarded. The trial court ordered that the marital home be placed on the market for sale on July 19, 1997 with each party responsible for, *inter alia*, one-half of the mortgage payment until said sale and that, thereafter, Husband was to pay alimony to Wife in varying amounts for four years. Husband submits that it is in Wife's best interest that the house sell later rather than sooner so as to prolong her "alimony" award of one-half of the house note. Husband contends that such is possible because of the final decree's failure to establish the initial price for which the home should be listed and who is responsible for determining the means by which it is to be sold. This omission, Husband insists, affords Wife the opportunity to "intentionally or inadvertently preclude" the home's sale by setting an "arbitrary sales price" or failing to use her best efforts to ensure a sale.

---

[5]In arriving at this figure, the court reasoned:

As the Court understands the law, the Court is required to make an award of child support based on quote, "present earnings." His present earnings are around $5,000 a month, $6,000 if you add them all right. I think that [Wife] acknowledges that this year's earnings are unusual. They are not consistent with prior years.

On the other hand, I think that the position taken by [Husband] that his earnings are in the thirties and they are going to be in the thirties in 1996 is not supported by the evidence unless he, number one, decides that he wants his earnings in the thirties. So the Court is of the opinion that it would not be fair to [Husband] to base the child support and any award on $5,000 a month gross. And on the other hand, it would not be fair to [Wife] and the minor child to base it on the minimum amount of money that he would earn just as a machinist. Somewhere in the middle, not in the middle, but somewhere in the middle of those two figures should be a benchmark to use . . . .

We first note that it does not appear from the record that Husband's obligation to pay one-half of the mortgage payments was meant as alimony to Wife. The final decree does not identify these payments as alimony. The better reasoning is that these payments were to assist and benefit both parties in preservation of a marital asset. Husband suggests that if there is a decline in the real estate market and the home's fair market value decreases by July 1997, then Wife has enjoyed the additional benefit of continued residency there. We find that any decline in the home's value places the parties at equal risk, with the exception of Wife's ability to remain in the home for an additional period of time. It is clear from the record, however, that such was ordered primarily for the benefit of the parties' minor child, which certainly Husband cannot seriously question. In any event, we agree with Wife that, should the situation arise where Husband has legitimate reason to question Wife's efforts in selling the home, he would be entitled to seek further remedies available to a tenant in common. Moreover, the final decree does not require Husband to agree to a sale of the home for an "arbitrary" or inadequate price; nor does it prohibit Husband's own efforts to sell the home. Any impropriety by either party can be remedied in the trial court.

Husband's final issue concerns the trial court's award of attorney's fees. In making the award, the trial court found that this litigation "didn't have to take as long as it did" and that Wife's "position in this matter, was exceedingly more reasonable given the facts and the state of the law as the Court understands it . . . ." After reviewing the record, we agree with the trial court's observation and conclude, especially in light of the economic circumstances of these parties, that attorney's fees were properly awarded. This issue is without merit.

The judgment of the trial court is affirmed and this cause remanded for any further necessary proceedings. Costs are taxed to the appellant, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
INMAN, Sr.J. (Concurs)